No. 96-493

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 301

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MICHAEL LAW OLMSTED,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Lisa B. Kauffman, Attorney at Law; Missoula, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,

Assistant Attorney General; Helena, Montana

Robert L. "Dusty" Deschamps III, Missoula County Attorney;

Betty Wing, Deputy County Attorney; Missoula, Montana

Submitted on Briefs: February 26, 1998

Decided: December 8, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. On February 16, 1995, Michael Law Olmsted was charged by information filed in the District Court of the Fourth Judicial District in Missoula County with three counts of burglary, felonies, in violation of § 45-6-204, MCA, one count of criminal possession of a dangerous drug as defined by § 50-32-101, MCA, and one count of possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA. Olmsted filed a motion to suppress all physical evidence which the State obtained through a warrantless search of his rented U-Haul truck, and all statements Olmsted made subsequent to the search. He also filed a motion to dismiss the charges against him based on his belief that the State violated his right to a speedy trial. The District Court denied both motions.**

**¶2. Following a mistrial, the State filed a third amended information which charged Olmsted with two counts of burglary in violation of § 45-6-204, MCA; two counts of felony theft in violation of § 45-6-301, MCA; and one count of misdemeanor theft. On December 21, 1995, at the conclusion of the second jury trial, the jury convicted Olmsted of all counts. Olmsted appeals the District Court's denial of his motion to suppress the physical evidence obtained as a result of the warrantless search of his rented U-Haul truck, and its denial of his motion to dismiss for lack of speedy trial.**

¶3. We affirm the judgment of the District Court.

¶4. The issues on appeal are:

¶5. 1. Did the State have a particularized suspicion to initiate an investigative stop of Olmsted?

¶6. 2. Did the warrantless search of Olmsted's rented U-Haul truck violate his right to privacy or his right to be free from unreasonable searches and seizures as guaranteed by the Montana Constitution?

¶7. 3. Did the State violate Olmsted's right to a speedy trial?

## FACTUAL BACKGROUND

¶8. On January 30, 1995, Scott Roberts provided the Missoula Police Department with information regarding six burglaries in Missoula. According to Detective James Lemcke of the Missoula Police Department, Roberts reported that Michael Law Olmsted and Olmsted's friend, Randy Munden, were involved in the burglaries and thefts. Roberts indicated that Olmsted and Munden used two-way radios to communicate with each other while committing the burglaries. Subsequently, Lemcke learned that on January 11, 1995, Olmsted used his credit card to purchase a pair of two-way radios.

¶9. At trial, Lemcke testified that Roberts stated that one of the businesses that Olmsted and Munden burglarized was Browning Ferris Industries (BFI). Lemcke confirmed that a person or persons had burglarized BFI on January 12, 1995, and had stolen a color television and VCR, a Sony video camera, a pocket knife, a lap top computer, and approximately $300.

¶10. According to Lemcke, Roberts also described the location of a second burglary in which Olmsted and Munden were involved. Although Roberts did not know the name of the burglarized business, he was able to describe the building sufficiently for Lemcke to identify it as the building in which Big Sky Brewing and Mother Moose are located. Lemcke was able to confirm that on January 12, 1995, both businesses had reported burglaries. Big Sky Brewing reported that it was missing a Macintosh computer, printer, monitor, modem, fax machine, and a Panasonic video camera.

Mother Moose reported that it was missing $125. The owner of the building, David Kester, reported that he was missing a briefcase which contained $6300 in cash.

¶11. According to Lemcke, the information that Roberts gave him regarding the thefts and burglaries matched the details found in the police reports that documented the January 12, 1995, burglaries.

¶12. Roberts admitted to Lemcke that he took possession of the Panasonic video camera, even though he knew that it was stolen. He brought the video camera and one of the stolen VCRs to the police. Roberts also told Lemcke that Randy Munden was concerned about the serial number on the stolen Macintosh computer, so Munden went to Sears, found a similar computer, pulled off the serial number and placed it on the stolen computer. Lemcke called Sears and confirmed that one of their Macintosh computers was missing its serial number.

¶13. Roberts told Lemcke where Munden lived, who he lived with, what kind of car he drove, and what kind of car his girlfriend drove. Two detectives checked on the information Roberts provided regarding Munden and determined that it was accurate. Roberts also told Lemcke that Olmsted was planning to leave town and had a U-Haul truck and tow-dolly parked in front of his house ready to go. A detective confirmed that this information was also accurate.

¶14. Roberts testified at trial that he had decided to share this information with the police because he was concerned about Munden's plans to break into the home of one of Roberts' acquaintances.

¶15. On January 30, 1995, the day that Roberts told the police that Olmsted might be leaving the state, Lemcke asked Detective Joe Gaffney to watch the U-Haul truck which was parked in front of Olmsted's residence. Lemcke told Gaffney to notify him if anyone came out of Olmsted's house and moved the U-Haul truck. Gaffney did as Lemcke requested.

¶16. At approximately 8:15 p.m., a vehicle pulled up near Olmsted's U-Haul truck, and two people got out. One person attached a tow-dolly loaded with a car to the U-Haul and then got into the U-Haul and began to drive away. Gaffney followed the driver of the U-Haul truck and notified Lemcke of what had occurred. Lemcke instructed Gaffney to stop and identify the driver of the U-Haul truck and ask for

consent to search the truck.

¶17. Gaffney approached the driver of the truck whom he identified as Michael Olmsted. Gaffney informed Olmsted that the Missoula Police Department was investigating information it had received that Olmsted may have participated in some recent burglaries and thefts and asked Olmsted if he could search the U-Haul truck. Olmsted asked Gaffney if he needed to consult with an attorney in order to decide if he should consent to the search. Gaffney responded that he could not advise him on that matter. Olmsted then asked what would happen if he refused to consent. Gaffney responded that he would impound the U-Haul truck until a search warrant could be obtained. Olmsted then gave Gaffney permission to search the vehicle. Gaffney advised Olmsted that he did not have to give his consent to search the vehicle. According to Gaffney, Olmsted stated that he understood and that he would still allow the truck to be searched. Olmsted then signed a consent-to-search form. At trial, Olmsted testified that he consented to the search and fully cooperated with Gaffney.

¶18. Following Roberts' tips, Lemcke completed a background check on Olmsted which indicated that Olmsted was on probation for the offenses of burglary and theft. Lemcke asked Detective Rich Ochsner of the Missoula Police Department to contact Olmsted's probation officer. On January 30, 1995, Ochsner contacted probation officer Jan Ullom. Ullom informed Ochsner that Earl Strubeck was Olmsted's supervising parole officer, but that he was out of town. Ullom indicated that she had no personal knowledge of Olmsted, but because Strubeck was out of town, Ullom reviewed Olmsted's file and verified that his conditions of probation included a search clause.

¶19. Olmsted's probation and parole records indicate that in 1989 he was convicted of burglary and theft and received a deferred imposition of sentence. In 1991, Olmsted was again convicted of burglary and theft. Consequently, the court reversed his deferred imposition of sentence and sentenced Olmsted to ten years in prison with six years suspended. Olmsted was paroled in 1992. One of the conditions of his probation, to which he agreed, was that he would submit to a search of his person, vehicle, or residence by a probation or parole officer at any time and without a warrant.

¶20. Gaffney conducted a cursory search of the U-Haul truck at the location of the

stop. Gaffney had no detailed information as to what was being sought by the Missoula Police Department; however, just after he began a cursory search, Ochsner and Ullom arrived at the scene. They decided that because of the rain and poor lighting, it would be better to take the U-Haul truck to the police station for a more thorough search. Olmsted agreed to drive the U-Haul truck to the station and, according to Gaffney, Ullom, and Ochsner, he was very cooperative.

¶21. After reading Olmsted his *Miranda*[1] rights, Ochsner attempted to interview him. Initially, Olmsted agreed to talk with Ochsner. He denied any knowledge of the burglaries and thefts and then stated "I won't say that I don't have any involvement, and I won't say that I don't know what you are talking about, but before I say any more I'm going to talk to a lawyer." Ochsner immediately ended the interview. After learning of this and being informed of the information gathered by the police, as well as being aware of the information in Olmsted's file, Ullom instructed the police officers to arrest Olmsted and to search the truck.

¶22. As a result of the search, police officers recovered the laptop computer stolen from BFI, a video camera stolen from BFI, and a fax machine stolen from Big Sky Brewing.

¶23. At trial, Olmsted testified that he unknowingly bought the stolen office equipment from Randy Munden who told Olmsted that he received the items from a friend who owed him money. According to Olmsted, Munden offered to sell him a laptop computer, a fax machine, and a video camera because Munden knew that Olmsted used these items in his business. Olmsted testified that he agreed to purchase these items for $1500, $500 of which he paid initially, and the rest which he agreed to pay upon reaching California where he planned to establish his new business. Olmsted testified that he did not know that these items were stolen when he purchased them.

¶24. Olmsted testified that on January 30, 1995, he had intended to leave the next day for California. That night he loaded the U-Haul truck and drove it to his girlfriend's house to spend the evening with her before departing in the morning. It was at Olmsted's girlfriend's house that Gaffney stopped Olmsted and asked if he could search the U-Haul.

¶25. At Olmsted's trial, Randy Munden testified that he agreed to cooperate with the

police and give them the names and places of the crimes in which he was involved, and the names of the people with whom he committed the crimes. Munden admitted burglarizing Big Sky Brewing and BFI and testified that Olmsted had participated with him in the burglaries.

## STANDARD OF REVIEW

¶26. Olmsted first contends that the District Court erred when it denied his motion to suppress the physical evidence obtained as a result of the warrantless search of his rented U-Haul truck. He argues that the State did not have a particularized suspicion to initiate an investigative stop and that the warrantless search of the U-Haul truck was unconstitutional. We review a district court's denial of a motion to suppress to determine if the district court's findings of fact are clearly erroneous and whether the district court correctly applied the findings of fact as a matter of law. *See State v. Burchett* (1996), 277 Mont. 192, 195, 921 P.2d 854, 856.

¶27. Olmsted also argues that the District Court incorrectly concluded that the State did not violate his right to a speedy trial. Whether a defendant has been denied a speedy trial is a question of constitutional law. *See City of Billings v. Bruce,* 1998 MT 186, ¶18, 965 P.2d 866, ¶18, 55 St. Rep. 750, ¶18. We review a district court's conclusions of law to determine whether its interpretation of the law is correct. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 696.

## ISSUE 1

¶28. Did the State have a particularized suspicion to initiate an investigative stop of Olmsted?

¶29. Section 46-5-401, MCA, provides:

In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

¶30. We have held that a particularized suspicion, not probable cause, is the

standard necessary for the State to initiate an investigative stop of an individual. *See State v. Gopher* (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. We use a two-part test in order to determine whether a particularized suspicion exists to justify an investigatory stop. First, objective data must exist from which an experienced officer can make certain inferences and, second, the objective data must lead to a suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing or was a witness to criminal activity. *See Gopher*, 193 Mont. at 194, 631 P.2d at 296. We must determine whether the totality of the circumstances presented in this case created a particularized suspicion. *See Anderson v. State, Dep't of Justice* (1996), 275 Mont. 259, 263, 912 P.2d 212, 214.

¶31. Olmsted contends that at the time Gaffney pulled him over, Gaffney was acting on a mere hunch and did not have a particularized suspicion to justify an investigative stop. We disagree. The facts of this case demonstrate that the Missoula Police Department knew that numerous burglaries and thefts had been committed in Missoula earlier that month and that Scott Roberts' detailed information about the burglaries and thefts implicated Olmsted in some of those crimes. The officers who were working under Lemcke's direction in the investigation corroborated much of the information Roberts provided.

¶32. After Lemcke received Roberts' information, he verified that it matched the information found in police reports which documented burglaries and thefts from Missoula businesses which occurred on January 12, 1995, and which were similar to those described by Roberts. Lemcke verified that one of the computers at Sears was missing a serial number as Roberts had described. Roberts correctly informed Lemcke that the police would find a U-Haul truck and tow-dolly loaded with a car, parked in front of Olmsted's residence.

¶33. We agree with the District Court that Roberts' information was reliable and trustworthy. We have previously held that it is proper for an officer to rely upon information which a reliable third person conveys in order to formulate a particularized suspicion. *See State v. Sharp* (1985), 217 Mont. 40, 46, 702 P.2d 959, 962. Roberts freely admitted that he had a video camera in his possession as a result of the burglaries, and he turned it over to the police. An informant's act of subjecting himself to criminal liability contributes to the trustworthiness of the information which he provides. *See State v. Adams* (1997), 284 Mont. 25, 37, 943 P.2d 955, 961-62. We have stated that "[a] person of known criminal activity or a person admitting his

own criminal activity is not likely to place himself in such a dubious position unless he is telling the truth." *State v. Garberding* (1990), 245 Mont. 356, 362, 801 P.2d 583, 586. Roberts' information was reliable, detailed, and accurate. It was more than an uncorroborated tip and it, along with the information officers were able to corroborate, provided the police with more than a mere hunch that Olmsted had been engaged in some kind of wrongdoing.

¶34. Olmsted further contends that because the arresting officer did not personally observe Olmsted committing illegal activity prior to initiating a stop, the police did not have the authority to stop him. We have held, however, that it is appropriate for an arresting officer to rely on information that is conveyed by reliable third persons or another officer in order to stop or arrest a person. *See Boland v. State* (1990), 242 Mont. 520, 524, 792 P.2d 1, 3, *overruled on other grounds by Bush v. State, Dep't of Justice*, 1998 MT 270, 55 St. Rep. 1118. We have also held that a particularized suspicion does not require certainty on the part of the law enforcement officer. *See State v. Morsette* (1982), 201 Mont. 233, 241, 654 P.2d 503, 507. In this case, although Detective Gaffney was not an eye witness to Olmsted's illegal activity, he correctly relied upon the collective information from all the detectives investigating this matter, as well as the information conveyed by Roberts.

¶35. The information provided to and gathered by the investigating officers was more than sufficient to support a particularized suspicion. Several burglaries and thefts of businesses had been reported to the police department earlier that month. Roberts implicated Olmsted in some of the crimes and reported to the police department that Olmsted had rented a U-Haul truck and was preparing to leave town. Olmsted had prior convictions for burglary and theft for which he was still believed to be serving a probationary sentence. When Gaffney watched Olmsted move the U-Haul truck and relayed that information to Lemcke, Lemcke reasonably feared that Olmsted was leaving town and may be taking stolen property with him. We conclude that there was a sufficiently particularized suspicion to justify Gaffney's investigative stop.

ISSUE 2

¶36. Did the warrantless search of Olmsted's rented U-Haul truck violate his right to privacy or his right to be free from unreasonable searches and seizures as guaranteed by the Montana Constitution?

¶37. Olmsted argues that the State violated his right to be free from unreasonable searches and seizures and his right to privacy when officers searched his U-Haul truck. He contends that the District Court should have suppressed the evidence which was obtained as a result of the search. We have held that a criminal defendant who seeks to suppress evidence has the burden of proving that the search was illegal. *See State v. McCarthy* (1993), 258 Mont. 51, 55, 852 P.2d 111, 113.

¶38. Pursuant to the Fourth and Fourteenth Amendments of the United States Constitution, and Article II, Section 11, of the Montana Constitution, warrantless searches and seizures are unreasonable unless carefully crafted exceptions exist. One such exception is when a person knowingly and voluntarily consents to a search. *See State v. Rushton* (1994), 264 Mont. 248, 257, 870 P.2d 1355, 1361. Olmsted contends that he did not consent to the search voluntarily because Gaffney coerced him into signing the consent-to-search form by leading him to believe that the police had sufficient evidence to obtain a search warrant for the U-Haul. However, based on our conclusion that the items seized were the result of a later search which was authorized, we decline to address this claim.

¶39. A warrantless search of a probationer's residence or vehicle does not require probable cause but rather, reasonable grounds. *See State v. Boston* (1994), 269 Mont. 300, 304-05, 889 P.2d 814, 816-17. Olmsted contends that Ullom did not have reasonable grounds to authorize the search of the U-Haul truck because Ullom relied on "uncorroborated information" provided by a confidential informant; Olmsted was not Ullom's client, and thus was not familiar with him; and because Olmsted had not committed a criminal act to trigger the search.

¶40. Lemcke instructed Ochsner to contact Olmsted's probation officer after learning that Olmsted had previous convictions for the crimes of burglary and theft and believing that he was, at the time, still serving a probationary sentence for those crimes. Ochsner contacted Ullom, a probation officer with Adult Probation and Parole. Ullom informed Ochsner that Earl Strubeck was the officer responsible for supervising Olmsted, but that he was out of town. Ullom volunteered to go to the probation office and research Olmsted's file. After doing so, she went to the Missoula Police Department where Lemcke shared with her all of the information he had gathered concerning Olmsted's involvement in the burglaries and thefts. Based upon this information, Ullom determined that there was reasonable cause for a search of Olmsted's U-Haul truck and communicated her conclusion to the detectives, who

then authorized Gaffney's search of the truck.

**¶41. As we previously discussed, the State had reason to believe the information provided by Scott Roberts was trustworthy. It was more than an uncorroborated tip and provided Ullom with more than a mere hunch that Olmsted had been engaged in wrongdoing. Moreover, even after taking Roberts' statement, Lemcke verified the fact that burglaries and thefts similar to those Roberts had described had actually occurred. Lemcke also verified that the personal information that Roberts gave about Olmsted was accurate. Therefore, we conclude that the information that Ullom relied upon to authorize the search was reliable and independently corroborated.**

**¶42. We have held that a probation officer "must be able to supervise the probationer, and upon his judgment and expertise, search the probationer's residence or cause it to be searched." *State v. Small* (1989), 235 Mont. 309, 312, 767 P.2d 316, 318. Olmsted contends that our conclusion implies that the only probation officer authorized to conduct such a search is the probation officer who is specifically assigned to that probationer. In this case, according to Olmsted, only Earl Strubeck had the authority to authorize a search of the U-Haul truck, regardless of whether he was available to give the authorization or not. Olmsted supports his argument with our reasoning in *State v. Burke* (1988), 235 Mont. 165, 766 P.2d 254, wherein we held:**

The probation officer acts upon a continued experience with the probationer, with knowledge of the original offense, and with the probationer's welfare in mind. Because of his expertise, we view the probation officer in a far superior position to determine the degree of supervision necessary in each case.

*Burke*, 235 Mont. at 169, 766 P.2d at 256.

**¶43. Based on this language, Olmsted concludes that it is the special relationship between a probation officer and a probationer that justifies the exclusive authority of that probation officer to conduct or authorize probation searches. He argues that Ullom did not have a continuing relationship with Olmsted, had no knowledge of Olmsted's original offense, had never met Olmsted, and possessed no expertise with regard to Olmsted. Because of these things, Olmsted contends that Ullom did not have the authority to allow a probationary search of his U-haul. We disagree.**

**¶44. Our reasoning in *Burke* was not intended to preclude all probation officers other**

than the one assigned to a probationer from authorizing a probationary search.

¶45. When Ullom learned of Olmsted's possible involvement in the same crimes for which he was on probation, she did not immediately authorize a search, but rather went to the police department to learn the nature and extent of the information the detectives had gathered. She correctly relied upon the information that the police investigation had uncovered. We have held that "due to the large land mass and mostly rural population of Montana, it would be impossible for the parole officers to supervise every probationer and, as such, police officers are needed to assist probation officers." *See Boston,* 269 Mont. at 305, 889 P.2d at 816-17. A requirement that only the supervising probation officer be allowed to evaluate the facts and circumstances surrounding a possible probation violation, and then determine if reasonable grounds exist to warrant a search, would greatly hamper the effectiveness of supervision during probation and diminish the public safety that supervision is intended to assure. We conclude, therefore, that probation officers must be able to support one another in order for the sanction of probation to work effectively. We further conclude that, for the reasons previously stated, Ullom had reasonable cause to authorize the search of Olmsted's U-Haul truck and that the search did not violate Olmsted's right of privacy and his right to be free from unreasonable searches and seizures.

¶46. We conclude that because the State had a particularized suspicion to initiate an investigative stop of Olmsted, and because the warrantless search of the U-Haul which yielded the evidence which Olmsted sought to suppress was constitutionally valid, the District Court did not err when it denied Olmsted's motion to suppress.

ISSUE 3

¶47. Did the State violate Olmsted's right to a speedy trial?

¶48. As stated above, whether a defendant has been denied a speedy trial is a question of constitutional law. *See City of Billings v. Bruce,* 1998 MT 186, ¶18, 965 P.2d 866, ¶18, 55 St. Rep. 750 ¶18. We review a district court's conclusions of law to determine whether its interpretation of the law is correct. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 696.

¶49. A criminal defendant's right to a speedy trial is guaranteed by the Sixth

Amendment to the United States Constitution, and Article II, Section 24, of the Montana Constitution. *See State v. Weeks* (1995), 270 Mont. 63, 71, 891 P.2d 477, 482. We review claims that a speedy trial was denied based on the four-part test established by the United States Supreme Court in *Barker v. Wingo* (1972), 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101, as applied in *City of Billings v. Bruce,* 1998 MT 186, ¶19, 965 P.2d 866, ¶19, 55 St. Rep. 570 ¶19. According to *Barker*, the four factors which a court must consider when evaluating an alleged speedy trial violation are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; (4) and the prejudice to the defendant. *See Barker*, 407 U.S. at 530, 92 S. Ct. at 292, 33 L. Ed. 2d at 117. Prejudice to the defense can be established based on any of the following factors: (1) pretrial incarceration; (2) anxiety and concern to the defendant; and (3) impairment of the defense. *See Barker,* 407 U.S. at 532, 92 S. Ct at 2193, 33 L. Ed. 2d at 118.

¶50. According to our reasoning in *Bruce*, we apply the *Barker* factors in the following manner to determine whether a defendant has been denied his or her right to a speedy trial in violation of the Sixth Amendment to the United States Constitution, or Article II, Section 24, of the Montana Constitution.

## Length of Delay

¶51. We consider the length of delay from the time charges are filed until the defendant's trial date without regard to fault of either party for the various periods of delay. *See Bruce, ¶55.* In this case, Olmsted was charged by information on February 16, 1995, and was tried on October 30, 1995; a delay of 256 days prior to trial. Based on our decision in *Bruce* that 200 days is the necessary length of time to trigger further speedy trial analysis, we conclude that the delay of 256 days prior to Olmsted's trial is sufficient to trigger further speedy trial analysis. *See Bruce, ¶55.*

## Reason for the Delay

¶52. In our consideration of the second factor of the *Barker* test, the reason for the delay, we allocate the delay by determining how much time is attributable to each party. *See State v. Heffernan* (1991), 248 Mont. 67, 71, 809 P.2d 566, 568. Any delay directly attributable to a motion to dismiss based on denial of speedy trial which is filed less than ten days prior to commencement of trial will be assigned to the defendant. *See Bruce, ¶57.* When it has been demonstrated that 275 days of delay is

attributable to the State, the burden shifts to the State to demonstrate that the defendant has not been prejudiced by the delay. *See Bruce*, ¶56. Olmsted's trial was scheduled for September, 6, 1995. Olmsted orally moved the District Court to dismiss the case for lack of speedy trial on August 29, 1995, 194 days after being charged and eight days before trial. On September 5, 1995, one day before the scheduled jury trial and 201 days after being charged, Olmsted filed his motion to dismiss for the State's violation of his right to a speedy trial. The timing of Olmsted's motion made it impossible for the District Court to begin the trial on September 6, 1995 as scheduled. On September 13, 1995, the District Court denied Olmsted's motion to dismiss and rescheduled the trial for October 30, 1995.

¶53. In this case, the state was responsible for an institutional delay of 201 days and, because he filed his motion to dismiss one day before trial, Olmsted was responsible for 54 days of the delay. Nonetheless, even if all 256 days were attributable to the State, the total delay is not sufficient to shift the burden to the State. Therefore, Olmsted continues to bear the burden of demonstrating prejudice based on one or more of the three factors considered when determining prejudice.

## Assertion of the Right to a Speedy Trial

¶54. When we consider the third *Barker* factor, whether the defendant's right to speedy trial has been timely asserted, we have held that if the right to speedy trial is invoked at any time prior to the commencement of trial, either by demanding a speedy trial, or moving to dismiss for failure to provide a speedy trial, the third prong is satisfied. *See Bruce*, ¶57. Because Olmsted moved to dismiss on speedy trial grounds prior to trial, we conclude that the third element of the *Barker* test, the defendant's assertion of his right to a speedy trial, is satisfied.

## Prejudice to Defendant

¶55. The fourth factor of the *Barker* test, prejudice to the defendant, must be demonstrated by the defendant before there is a speedy trial violation. *See State v. Waters* (1987), 228 Mont. 490, 494, 743 P.2d 617, 620. The importance of this factor and the degree of prejudice needed to establish denial of speedy trial will vary based upon other considerations, such as length of delay and the reason for delay. *See Bruce*, ¶58. In order to determine whether the defendant has been prejudiced, the court analyzes three interests which the right to a speedy trial is designed to protect:

(1) avoiding oppressive pretrial incarceration; (2) minimizing the anxiety of the accused; and (3) avoiding impairment of the defendant's defense. *See State v. Hembd* (1992), 254 Mont. 407, 413-14, 838 P.2d 412, 416.

¶56. The first interest, avoiding oppressive pretrial incarceration, does not apply in this case. Olmsted was released on bond and not incarcerated prior to trial.

¶57. As for the second interest, excessive anxiety and concern, Olmsted contends that he has proven this type of prejudice because newspaper accounts stigmatized him as a burglar, because he was unable to leave Montana to take advantage of a job opportunity, and because the reopening of his business and the need to secure living arrangements caused him difficulty and anxiety. We have previously recognized, however, that although direct proof of a defendant's state of mind may not always be possible, *see Bruce* ¶56, a certain amount of anxiety and concern is inherent in being accused of a crime. *See State v. Foshee* (1997), 282 Mont. 326, 334, 938 P.2d 601, 606. The existence of anxiety or emotional distress is notoriously difficult to prove. *See State v. Curtis* (1990), 241 Mont. 288, 303, 787 P.2d 306, 316. Every person charged with a felony offense has to live with uncertainty about his or her future liberty since a period of incarceration is always a possibility. Likewise, every person charged with a felony offense could argue that he or she has been stigmatized. Olmsted, however, has failed to demonstrate how his anxiety and concern is more excessive than that of other individuals who are charged with felonies. Moreover, in this case, Olmsted had been previously convicted of burglary charges and, therefore, any stigma which attached to Olmsted as a result of being charged with criminal conduct had already occurred. Finally, there is no evidence in the record which demonstrates that Olmsted suffered economic hardship. In fact, Olmsted stated that he had "re-established his business in Missoula and rented a small office on a month-to-month lease."

¶58. On appeal, Olmsted does not argue that the third interest, the impairment of his defense, applies to this case.

¶59. Accordingly, we conclude that Olmsted has not carried his burden of demonstrating prejudice from the delay of his trial date.

¶60. No single factor of the *Barker* analysis is determinative, and each must be weighed in light of the facts of this case to determine if Olmsted was denied his right

to speedy trial. *See Bruce*, ¶75. After weighing all three prongs of the *Barker* test, we conclude that while there was institutional delay attributable to the State of 201 days, and 54 days of delay attributable to Olmsted, Olmsted did not demonstrate sufficient prejudice to establish that his October 30 trial date denied his constitutional right to a speedy trial.

¶61. Further, we have held that when a mistrial is declared, the speedy trial clock is reset and begins to run from the date of the mistrial. *See State v. Sanders* (1973), 163 Mont. 209, 214, 516 P.2d 372, 375. Therefore, the time which lapsed between the mistrial on November 2, 1995, and the second trial on December 18, 1995, a delay of 46 days, does not trigger a speedy trial analysis. We conclude that the District Court properly denied Olmsted's motion to dismiss.

¶62. Accordingly, we hold that Detective Gaffney had a particularized suspicion to initiate an investigative stop of Olmsted, that probation officer Ullom had reasonable grounds to authorize a probationary search of the U-Haul truck, and that the delay in this case did not prejudice Olmsted and was not unreasonable in light of the complexity of the case. Therefore, we conclude that the District Court correctly denied Olmsted's motion to suppress the evidence gained through the search, and properly denied his motion to dismiss for lack of speedy trial. We affirm the judgment of the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

1. [1]*Miranda v. Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694