No. 99-346

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 232

301 Mont. 289

8 P. 3d 801

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MICHAEL ELLENBURG,

Defendant and Appellant.

APPEAL FROM: District Court of the Missoula Judicial District,

In and for the County of Missoula,

The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William Boggs, Attorney at Law, Missoula, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Pamela P. Collins,

Assistant Attorney General; Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney, Missoula, Montana

Submitted on Briefs: April 27, 2000

Decided: August 24, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 By Information filed on October 14, 1997, in the District Court for the Fourth Judicial District in Missoula County, the Defendant, Michael Ellenburg, was charged with the following offenses: three counts of common scheme theft, a felony, in violation of § 45-6-301(1)(a) and (b)(8), MCA; forgery, a felony, in violation of § 45-6-325(1)(a), MCA; and two counts of elder abuse, a misdemeanor, in violation of §§ 52-3-803(3)(8) and -825(2), MCA. Ellenburg filed motions to dismiss based on denial of speedy trial and *Brady*[1] violations. The District Court denied his motions. Pursuant to a plea agreement, Ellenburg pled guilty to two counts of theft and forgery, and the State dismissed the remaining charges. Ellenburg now appeals the District Court's denial of his motions to dismiss. We affirm the judgment of the District Court.

¶2 The following issues are presented on appeal:

¶3 1. Did the State violate Ellenburg's right to a speedy trial?

¶4 2. Did the District Court err when it denied Ellenburg's motion to dismiss based on *Brady* violations?

## FACTUAL BACKGROUND

¶5 In the fall of 1996, the Defendant, Michael Ellenburg, a licensed insurance agent, was incarcerated in the Montana State Prison for driving a vehicle while under the influence of alcohol. In December 1996, Ellenburg was released to the Intensive Supervision Program (ISP) in Missoula, under the supervision of ISP Officer Steve Miller. A condition of

Ellenburg's release to the ISP program was that "upon reasonable cause, you shall . . . submit to a search of your person, vehicle or residence by an Intensive Supervision Officer or designee, at any time without a warrant."

¶6 In April 1997, Miller was contacted by Leon Belville of the Montana State Auditor's Office and was informed that the auditor's office believed Ellenburg was involved in a financial crime against an elderly person and the auditor's office was conducting an investigation.

¶7 In June 1997, Miller became aware that Ellenburg had petitioned the District Court to authorize community service in lieu of the $5655 that he was required to pay to the District Court as a result of his DUI conviction. Miller immediately sent a letter to the District Court in which he objected to Ellenburg's request. Miller informed the District Court that Ellenburg's monthly financial reports revealed that Ellenburg had sufficient money at the end of each month to pay his fines without difficulty. Based on this information, the District Court ordered Miller to determine Ellenburg's financial status and report back to the court.

¶8 In order to determine Ellenburg' financial status, Miller decided that it was necessary to search Ellenburg's office which was located in his Missoula residence. On June 13, 1997, Miller and his partner, Chuck Hill, arrived at Ellenburg's residence and informed him that they were going to search his office. Miller then searched the office and seized several documents, including Ellenburg's bank statements and cancelled checks. Miller then returned to his office where he analyzed the documents he had seized. He discovered that since his release to the ISP, Ellenburg had written checks worth more than $15,000 to local bars and casinos. Because a condition of Ellenburg's release to ISP was that he not enter any bars or casinos, Miller determined that Ellenburg had violated the conditions of his release and, therefore, should be arrested and returned to the Montana State Prison. Miller arrested Ellenburg later that day.

¶9 Miller returned to Ellenburg's residence the following day to conduct a more thorough search of Ellenburg's office. He seized additional documents from Ellenburg's office, including papers with the name of Gunlock, which he had been previously informed by the State Auditor's Office was the name of the elderly victim in their investigation. On June 19, 1997, Miller met with Belville, the State Auditor's Office investigator, and turned over the documents he had seized from Ellenburg's office to Belville for use in his investigation.

¶10 Based upon the auditor's investigation, the State filed its Information on October 14, 1997. The Information charged the following: Count I, felony theft in violation of § 45-6-301(1)(a) or (b), MCA, as a result of Ellenburg's deposit and personal use of a viatical settlement check in the amount of $48,000, payable to Kenneth Gunlock; Count II, common scheme felony theft in violation of § 45-6-301(1)(a) or (b)(8), MCA, as a result of Ellenburg's deposit and personal use of approximately $38,850 received from Kenneth Gunlock for insurance premiums; Count III, common scheme felony theft in violation of § 45-6-301(1)(a) or (b)(8), MCA, as a result of Ellenburg's deposit and personal use of approximately $49,785 received from Harold and Lillie Gunlock for insurance premiums; Count IV, felony forgery in violation of § 45-6-325(1)(a), MCA, as a result of Ellenburg's forgery of the signature of Kenneth Gunlock on the $48,000 viatical settlement; Counts V and VI, elder abuse in violation of §§ 52-3-803(3), (8) and -825(2), MCA, as a result of Ellenburg's fraudulent exploitation of Kenneth Gunlock, who is over 60 years of age.

¶11 On October 31, 1997, Ellenburg appeared for arraignment with his counsel from the Missoula County Public Defender's Office. Ellenburg pled not guilty to all six counts. The District Court set the scheduling conference for December 19, 1997. On December 19, 1997, the trial scheduling conference was continued to February 13, 1998, to allow Ellenburg time to prepare his omnibus hearing memorandum. On January 30, 1998, Ellenburg's counsel moved for a stay of the proceedings in this case, pending the outcome of a complaint Ellenburg had filed against him with the Commission on Practice. On April 29, 1998, the District Court appointed Ellenburg's current counsel, William Boggs, to represent him. On May 27, 1998, the District Court gave the Defendant two additional weeks to complete his omnibus hearing memorandum. On July 1, 1998, the District Court ordered Miller to cooperate with Ellenburg's counsel during discovery. On July 15, 1998, the District Court again ordered Miller to cooperate and supervised his immediate cooperation. The District Court then set a scheduling conference for September 25, 1998. Prior to the scheduling conference, both parties stipulated to its continuance to October 23, 1998. On October 23, 1998, the District Court continued the scheduling conference to November 12, 1998.

¶12 On November 12, 1998, the District Court held the scheduling conference, at which it scheduled an evidentiary hearing for January 22, 1999, to consider any pretrial motions. On November 17, 1998, Ellenburg filed a motion to dismiss pursuant to *Brady*, based on the search and seizure conducted by Miller, and a motion to dismiss for violation of his right to a speedy trial. The District Court then rescheduled the evidentiary hearing for January 28, 1999. Following the evidentiary hearing, on February 18, 1999, the District

Court orally denied Ellenburg's motions to dismiss. The parties then advised the District Court that they had reached a plea agreement, as a result of which Ellenburg would plead guilty to Counts II, III, and IV and the State would dismiss Counts I, V, and VI. Ellenburg reserved the right to appeal the District Court's denial of his motions to dismiss.

## DISCUSSION

## ISSUE 1

¶13 Did the State violate Ellenburg's right to a speedy trial?

¶14 Ellenburg contends that the District Court incorrectly concluded that the State did not violate his right to a speedy trial. Whether a defendant has been denied a speedy trial is a question of constitutional law. *See City of Billings v. Bruce*, 1998 MT 186, ¶ 18, 290 Mont. 148, ¶ 18, 965 P.2d 866, ¶ 18. We review a district court's conclusions of law to determine whether its interpretation of the law is correct. *See State v. Kipp*, 1999 MT 197, ¶ 7, 295 Mont. 399, ¶ 7, 984 P.2d 733, ¶ 7.

¶15 The Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution, guarantee a criminal defendant's right to a speedy trial. *See Kipp*, ¶ 8. In *Kipp*, we stated:

> In *Barker v. Wingo* (1972), 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101, the United States Supreme Court established four factors which must be considered in any review of a claim that a speedy trial was denied: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. *See Barker*, 407 U.S. at 530, 92 S.Ct at 2192, 33 L. Ed. 2d at 117. Prejudice to the defendant can be established based on any of the following: (1) pretrial incarceration; (2) anxiety and concern to the defendant; or (3) impairment of the defense. *See Barker*, 407 U.S. at 532, 92 S. Ct. at 2193, 33 L. Ed. 2d at 118.

*Kipp, ¶ 8.*

¶16 First, we consider the length of delay from the time charges are filed until the defendant's trial date, or the date on which the defendant pled guilty, whichever date represents the date of disposition of the case. *See Kipp*, ¶ 9. If the delay is 200 days or

longer, further speedy trial analysis is necessary. *See Bruce,* ¶ 55.

¶17 In this case, the District Court found that there were 493 days of delay from the date the Information was filed on October 14, 1997, to the date of Ellenburg's trial on February 19, 1999. However, Ellenburg pled guilty to the charges on February 18, 1999, which represents the disposition in this case. Accordingly, there were 492 days of delay, which renders further speedy trial analysis necessary.

¶18 Second, we consider the reason for the delay to determine how many days of delay are attributable to the State. If the delay attributable to the State is less than 275 days, the burden remains on the defendant to demonstrate prejudice. *See Bruce*, ¶ 56. If we conclude that 275 days or more of delay are attributable to the State, the burden shifts to the State to demonstrate that the defendant has not been prejudiced by the delay. *See Bruce*, ¶ 56. When delay is either institutional or caused directly by the prosecution, it is attributable to the State. *See Bruce*, ¶ 61. Moreover, "the State bears the burden of prosecution, and a defendant is under no obligation to ensure diligent prosecution of the case against him or to help the State avoid dismissal for failure to timely prosecute him." *See Kipp,* ¶ 10.

¶19 The District Court found that of the 493 days of delay, 99 days were attributable to the State and 159 days were attributable to Ellenburg. The District Court then stated that the remaining days of delay "were with the agreement of both parties and/or in response to the Defendant's motions request for hearing, hearing and supplement briefing and, is, therefore, not attributable to the State."

¶20 On Appeal, the State admits that 191 days of delay are attributable to the State. Based on our review of the record, we conclude that an additional 29 days of delay are attributable to the State. The 29 days between September 24, 1998, and October 23, 1998, are attributable to the State because they reflect the continuation of the trial scheduling conference pursuant to stipulation of both counsel. There is no indication that Ellenburg requested the continuance, nor did Ellenburg agree that the amount of time resulting from that delay would not count against the State for purposes of speedy trial analysis. Therefore, the delay is institutional and attributable to the State. Accordingly, 220 days of delay are attributable to the State.

¶21 The essence of disagreement on appeal is whether any of the remaining 272 days of delay were attributable to the State. The first period of delay includes 131 days between

December 19, 1997 and April 29, 1998. The District Court attributed this delay to Ellenburg.

¶22 Following Ellenburg's first appearance on October 31, 1997, the District Court scheduled November 28, 1997, for the omnibus hearing memorandum and December 19, 1997, for the trial scheduling conference. On December 19, 1997, Ellenburg requested until January 30, 1998, for the omnibus hearing memorandum and February 13, 1998 for the trial scheduling conference. In January 1998, Ellenburg filed a complaint with the Commission on Practice against the public defender appointed to represent him. The District Court's minutes on January 30, 1998, reflect that the public defender, because of the complaint filed against him by his client, requested that the District Court stay the proceedings until the Commission could act on the complaint. The District Court granted the stay. On April 29, 1998, the District Court held a hearing, during which the District Court was informed that the complaint against the public defender had been dismissed by the Commission on Practice, and that Ellenburg had now filed a complaint with the Commission on Practice against the public defender's supervising attorney. In order to get the case moving again, and because of the second complaint filed with the Commission on Practice (which also was subsequently dismissed by the Commission), the District Court appointed a private attorney, William Boggs, to represent Ellenburg. We conclude that the District Court correctly attributed these 131 days to Ellenburg.

¶23 The second time period at issue is April 29, 1998 to May 27, 1998, which includes 28 days of delay. The District Court attributed this delay to Ellenburg. The period of delay from April 29 to May 27, 1998, was the time that the District Court gave Boggs to meet with Ellenburg and become familiar with the case prior to the trial scheduling conference on May 27, 1998. The trial scheduling conference was initially scheduled for December 19, 1997. The conference was then rescheduled due to Ellenburg's request until January 30, 1998 and finally cancelled because of Ellenburg's complaint against his attorney. Accordingly, had the Defendant not filed a meritless complaint with the Commission on Practice against his attorney, the trial scheduling conference would most likely have taken place on January 30, 1998.

¶24 Moreover, had the Defendant not filed a second meritless complaint against his attorney's supervisor, which required the public defender's office to either step down as counsel, or further stay the proceedings, there would have been no need for Ellenburg to be appointed new counsel, and, therefore, no need for an additional month for new counsel to meet with his client and become familiar with the case prior to a trial scheduling

conference. For these reasons, we conclude that the District Court properly attributed the additional 28 days of delay from April 29 to May 27, to Ellenburg.

¶25 The third period at issue includes 15 days between May 27, 1998 and June 11, 1998. The District Court did not attribute this delay to either the State or Ellenburg. On May 27, 1998, the date set for the trial scheduling conference, Ellenburg's counsel requested an additional two weeks in which to file the omnibus form. Because the delay was at the request of Ellenburg, we conclude that these 15 days should be attributed to Ellenburg.

¶26 The fourth time period includes the 29 days between September 25 and October 23, 1998. The District Court attributed this delay to the Defendant. The District Court's September 25, 1998, minutes reflect that "pursuant to stipulation of counsel, the trial scheduling conference is continued to Friday, October 23, 1998." As we noted previously, the mere stipulation to a continuance is not sufficient reason to attribute delay to a defendant. Therefore, we conclude that the District Court erred when it attributed these 29 days of delay to Ellenburg.

¶27 The final period of delay is from November 12, 1998 to February 18, 1999, a delay of 98 days. The District Court attributed this delay to Ellenburg. On November 12, 1998, the District Court held the trial scheduling conference. The Defendant informed the District Court that there would be defense pretrial motions and proposed a briefing schedule and evidentiary hearing. Based on that information, the District Court set the date of trial as February 19, 1999. Then the record reflects the following exchange:

> Mr. Van Valkenburg: Judge, the one thing I want the record to reflect as clearly as possible, is that the delay involved in these resolving matters between now and the time of trial is essentially at the request and acquiescence of the Defendant.
>
> Mr. Boggs has just proposed a schedule to you, is essentially a schedule that is set out to accommodate Defense motions in preparation for trial. And I know, given the current state of the case law in the state of Montana, that it is essential-I think we make clear that any delay involved is attributable to the Defendant.
>
> The Court: Mr. Boggs, do you want to make any additional comments?
>
> Mr. Boggs: And I agree with Mr. Van Valkenburg, the Defense has proposed the schedule. It involves a lot of Defense motions in preparation.

The Court: And the Court will attribute the delay to the Defendant.

Mr. Van Valkenburg: Thank you.

The Court: Any other issues?

Mr. Van Valkenburg: No, Your Honor. Thank you.

Mr. Boggs: No

¶28 Under normal circumstances this time would be considered institutional delay attributable to the State, because it is regular trial preparation. The fact that the Defendant proposed the schedule to file defense motions does not mean that any delay which resulted was attributable to the Defendant. However, defense counsel's failure to object to, and implied agreement with the State's assertion and the District Court's determination that the delay would be attributed to Ellenburg, amounts to a waiver of the right to contest that determination on appeal. Had defense counsel objected to such a determination, it would have given the State and the District Court notice that the attribution of the 98 days of delay would be contested, and the District Court could have accelerated the schedule, or the State could have objected to defense counsel's proposed schedule as too lengthy.

¶29 The State has the burden of prosecution and, therefore, the burden to provide a speedy trial. *See Kipp*, ¶ 10. However, in this situation, it would be unfair to charge the State with time that Ellenburg had essentially conceded was attributable to him by failing to object to the District Court's characterization of the delay.

¶30 This situation is similar to those cases in which defense counsel agrees with the State at the District Court level that a certain amount of delay will not be attributable to the State, and in which, on appeal, we do not include that time in our calculation of delay attributable to the State. *See Bruce*, ¶ 61.

¶31 Accordingly, we conclude that the District Court properly attributed this time period of delay to Ellenburg.

32 ¶Based on our holding that the State is responsible for 220 days of delay, we conclude that there is not sufficient delay to shift the burden to the State to prove that Ellenburg was not prejudiced by the delay. Accordingly, Ellenburg has the burden to demonstrate

prejudice. We consider the prejudice to Ellenburg from the delay in his trial, based on traditional considerations such as pretrial incarceration, anxiety, or impairment of a defense. *See Bruce*, ¶ 58.

¶33 The District Court stated as follows:

> The Court notes that throughout these proceedings Ellenburg has been incarcerated at the Montana State Prison following the searches noted above. His incarceration resulted from his own choices while at prison and was unrelated to these proceedings. As such, Ellenburg did not establish oppressive pretrial incarceration-his choices kept him in prison. As to anxiety of the accused-he presented no testimony and has asked to be returned to prison programs while awaiting trial. Finally, as for impairment of the defense-Ellenburg has caused delay, confusion and frustration by his own actions in filing and then dismissing complaints to the Commission on Practice as well as pro se appeals to the Montana Supreme Court. The standards applied under *State v. Olmstad*, [1998 MT 301], 292 Mont. 66, 968 P.2d 1154, yield a conclusion that the impact of incarceration on Ellenburg and his defense was not prejudicial.

¶34 Ellenburg contends that he suffered all three types of prejudice. First, he asserts that he suffered oppressive pretrial incarceration because he was incarcerated during the entire 492 days that this charge was pending against him. He further asserts that the District Court erroneously concluded and the State incorrectly argues that his incarceration was not prejudicial because it was related to a different charge. Ellenburg contends that his incarceration was directly and demonstrably caused by the pending charges.

¶35 Our review of the record reveals that Ellenburg was incarcerated as the result of a DUI conviction prior to the charges in this case. He was paroled on ISP status in December 1996. His parole was subsequently revoked on June 13, 1997, as a result of his violations of the conditions of his ISP status. On September 29, 1997, the State of Montana Board of Pardons and Parole again granted Ellenburg parole on ISP status. However, on October 2, 1997, Ellenburg was advised that due to misconduct on his part, he would not be scheduled for release until he had 120 days of clear conduct. Accordingly, the earliest date Ellenburg could be considered for parole was on January 30, 1998. On January 21, 1998, the Parole Board informed him that "[t]he Board will not authorize, endorse, or consider the possibility of community placement prior to final adjudication on the pending charge in Missoula County."

¶36 Due to further misconduct by Ellenburg, he received a letter from the Parole Board on May 7, 1998, again advising that he would not be scheduled for release until he had 120 days of clear conduct. Following further misconduct by Ellenburg, the Parole Board rescinded Ellenburg's parole on August 31, 1998. Additionally, as a result of his ISP violations which led to revocation of his ISP status, the Parole Board cancelled a loss of 90 days of good time that Ellenburg had earned. Accordingly, his date of discharge from prison was moved to March 6, 1999. Ellenburg pled guilty to the pending charges in February 1999.

¶37 We agree with the District Court that Ellenburg has failed to establish that he has been prejudiced by oppressive pretrial incarceration. We further agree that Ellenburg's incarceration was the result of a different charge and Ellenburg's misconduct while incarcerated. While Ellenburg has speculated that, but for the pending claim, he would have been paroled, Ellenburg has failed to demonstrate that the denial of his parole was a result of the charges in this case.

¶38 The second consideration is whether Ellenburg can demonstrate that he was prejudiced by anxiety or concern. *See Bruce*, ¶ 68. The District Court found that Ellenburg "has presented no testimony and has asked to be returned to prison programs while awaiting trial."

¶39 On appeal, Ellenburg asserts that:

> [T]he defendant suffered extreme anxiety as a result of the pending charges, his own actions reveal. He wrote numerous letters to his attorney, some agitated in tone. He filed complaints in the Commission on Practice because, in his perception, nothing was being done. He submitted pro se pleadings to the Court. He felt an utter sense of desperation and lack of any ability to influence the course of proceedings. He felt particular anxiety about being unable to return to his office and review his business records in preparation for trial.

¶40 We have previously recognized that anxiety and concern are an inherent part of being charged with a crime. *See Bruce*, ¶ 70. As discussed previously, our review of the record reveals that a majority of the anxiety and concern Ellenburg contends he suffered was a result of his own actions. Accordingly, we conclude that the District Court correctly found that Ellenburg has failed to sustain his burden of demonstrating that the delay prejudiced him by causing anxiety and concern.

¶41 Finally, we consider whether Ellenburg can demonstrate that the delay in his case prejudiced him by impairing his defense. *See Bruce*, ¶ 68. Ellenburg asserts that his defense was impaired as a result of his incarceration from the day he was arrested until the day of trial, which prevented him from accessing his business records which he asserts would have been exculpatory. Ellenburg further contends that the delay prejudiced him as a result of the State's probable loss or destruction of documents seized from his office

¶42 In response, the State contends that Ellenburg's assertions fail to satisfy his burden to demonstrate prejudice. The State notes that Ellenburg has failed to specifically describe the exculpatory documents he could not access, and does not explain how the documents would assist him in his defense. The State further points out that Ellenburg could have requested that his attorney, or some other person, access his office and find the relevant documents. The State also asserts that, even assuming for the sake of argument that some documents existed and were lost, Ellenburg has failed to meet his burden to demonstrate that such documents were material and exculpatory.

¶43 Based on our review of the record, we agree that Ellenburg has failed to demonstrate that the delay in bringing his case to trial impaired his defense based on the loss of or unavailability of exculpatory evidence.

¶44 Accordingly, we conclude that Ellenburg has failed to meet his burden of proving prejudice as a result of the delay in bringing his case to trial. Therefore, we further conclude that the District Court did not err when it dismissed Ellenburg's motion to dismiss for lack of speedy trial.

## ISSUE 2

¶45 Did the District Court err when it denied Ellenburg's motion to dismiss based on *Brady* violations?

¶46 Ellenburg asserts that the prearraignment seizure of his business records and then loss of records which could have been exculpatory had the effect of suppressing exculpatory evidence and was, therefore, a denial of due process in violation of *Brady v. Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215.

¶47 The United States Supreme Court's decision in *Brady* established the constitutional rule that "[t]he suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U. S. at 87, 83 S. Ct. at 1196-97. In order to mandate a reversal of a defendant's conviction, "the *Brady* violation must relate to material information." *Lester Kills on Top v. State* (1995), 273 Mont. 32, 42, 901 P.2d 1368, 1374-75. To satisfy the materiality requirement the defendant must prove "that there is a reasonable probability that had the information been provided, the result would have been different or stated another way, is it a 'verdict worthy of confidence'?" *Kills on Top*, 273 Mont. at 42, 901 P.2d at 1374.

¶48 The District Court concluded as follows:

> Ellenburg argues that the State has no legal authority for the searches at his Missoula residence on June 13-14, 1997, but the state counters with his status as an inmate of Montana State Prison, on pre-release/ISP status.

> Ellenburg next submits that the failure of the State to produce an inventory of items secured from the above searches requires dismissal. The State submits that only searches pursuant to a warrant, § 46-5-227, MCA, are required to provide an inventory of items seized.

> This Court is persuaded that the State's search of Ellenburg's residence was authorized by his ISP agreement and that no inventory was required, § 46-5-227, MCA. Accordingly, Ellenburg's Motions to Dismiss on those grounds be and the same is hereby denied.

¶49 Ellenburg does not challenge the District Court's determination on appeal, but asserts that the mere fact no inventory was prepared violates his federal due process rights, even in the absence of prejudice. Ellenburg fails to set forth any authority in support of his assertion, instead stating that his position is "obvious." We have stated on numerous occasions that we will decline to address an issue when the appellant fails to cite to supporting authority. *See State ex. rel. Booth v. Montana*, 1998 MT 344, ¶ 35, 292 Mont. 371, ¶ 35, 972 P.2d 325, ¶ 35. Accordingly, we decline to address Ellenburg's due process argument based on the State's failure to inventory the items taken from his office.

¶50 Ellenburg additionally contends that the District Court should have dismissed his case as a result of the State's *Brady* violations. Ellenburg asserts that the State's loss of documents which would have been exculpatory violated his right to due process.

¶51 In response, the State contends that there was no basis for dismissal based on a *Brady* violation because there was no requirement that an inventory be prepared of evidence seized pursuant to an ISP agreement; there was no evidence other than Ellenburg's own testimony that exculpatory evidence was lost or destroyed, but there was evidence to the contrary; and the evidence Ellenburg alleges was missing could have been provided by other means.

¶52 In *Gollehon v. State*, we set forth as follows:

> To establish a *Brady* violation, the petitioner must establish that: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the petitioner did not possess the evidence nor could he have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *See Mills v. Singletary*, 63 F.3d 999, 1014 (citation omitted) (11th Cir.1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996).

*Gollehon v. State, 1999 MT 210, ¶ 15, 296 Mont. 6, ¶ 15, 986 P.2d 395, ¶ 15.*

¶53 First, Ellenburg asserts that the State violated *Brady* when it allegedly lost a letter which accompanied a blank check signed by Harold Gunlock. Ellenburg asserts that the letter authorized him to cash the check to pay for additional premiums.

¶54 The State points out that even if the letter existed, no *Brady* violation occurred because Ellenburg could have obtained comparable evidence by other reasonably available means, such as the testimony of Harold Gunlock. The State relies on the following, as set forth by the United States Supreme Court:

> Whatever the duty the constitution imposes on the state to preserve evidence, that duty must be limited to those that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*California v. Trombetta (1984), 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2534. Moreover, the State*

*notes that the evidence would not have been exculpatory because the letter and the blank check had no relevance to the charges in this case. We agree that Ellenburg has failed to demonstrate the letter's relevance.*

¶55 Ellenburg next asserts that the State violated *Brady* by allegedly losing documents, including a power of attorney from Kenneth Gunlock, a prospectus from the Fidelity Alliance Company, and records of court proceedings regarding Fidelity's bankruptcy, all of which related to his alleged reinvestment of the $48,000 check payable to Kenneth Gunlock.

¶56 In response, the State points to Miller's testimony, in which he testified that he did not seize those types of documents and that the only items he did seize were bank statements, cancelled checks, and viatical documents. The State further points out that Ellenburg could have obtained comparable evidence by other reasonably available means.

¶57 We agree that Ellenburg has not demonstrated that he was unable to obtain comparable evidence by other reasonably available means. Therefore, we conclude that Ellenburg has failed to demonstrate that his due process rights were violated. Accordingly, we further conclude that the District Court did not err when it denied Ellenburg's motion to dismiss based on a *Brady* violation.

¶58 The judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

1. *Brady v. Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215.