JUSTICE NELSON,
specially concurring.
¶126 I concur in the ultimate results the Court reaches on all four issues, but I do not agree with all of the Court’s reasoning. My primary concerns relate to the Court’s decision on the speedy trial issue (Issue 1). Thus, I limit my discussion here to that specific issue.
¶127 For one thing, the Court’s speedy trial analysis contains a number of factual errors and unsupported legal propositions. The Court also paints extremely one-sided pictures of the circumstances related to Factors Two and Four. For instance, the Court unduly minimizes the conditions of Rose’s incarceration and overstates the extent to which Rose caused pretrial delay. Along these same lines, the Court totally ignores the District Court’s role in unnecessarily delaying Rose’s trial. Lastly, in several instances, the Court misapplies the revised speedy trial test articulated in State v. Ariegwe, 2007 MT 204, 338 Mont. 442, 167 P.3d 815. Under Factor Two in particular, the Court does not follow the approach we established in Ariegwe and repeated in State v. Billman, 2008 MT 326, 346 Mont. 118, 194 P.3d 58. See Ariegwe, ¶¶ 124-134; Billman, ¶¶ 22-30.1 address these and *318 other points in the following application of the Ariegwe test to the facts of this case.
FACTOR ONE: THE LENGTH OF THE DELAY
¶128 I agree with the Court’s calculation of a 507-day delay between arrest and trial. Opinion, ¶ 45.1 also agree that the State’s burden to justify the delay under Factor Two is “increased substantially” and that the State must make a “highly persuasive showing” under Factor Four that Rose was not prejudiced by the delay. Opinion, ¶¶ 46, 66. It is important to point out, however, that in Ariegwe the delay stretched 208 days beyond the 200-day trigger date for speedy trial analysis, see Ariegwe, ¶ 123, while here the delay stretches 307 days beyond the trigger date. In Ariegwe, we stated that the State must provide “particularly compelling justifications” for the delay under Factor Two and must make a “highly persuasive showing” under Factor Four that Ariegwe was not prejudiced by the delay. Ariegwe, ¶ 123. Accordingly, the burden on the State in the present case is even heavier under these two factors.
FACTOR TWO: THE REASONS FOR THE DELAY
¶129 At the outset of discussing Factor Two, I note that my primary disagreement with the Court’s analysis is its failure to acknowledge and properly attribute the substantial amount of avoidable delay in this case. As explained below, there are significant blocks of time during which no trial date was set, which in turn created delay for which there was no constitutionally acceptable justification. Such delay certainly cannot be blamed on Rose, as the Court has done. Rather, it must be attributed to the State.
¶130 In this connection, it is necessary to recall the basic principles which dictate our approach under Factor Two. For one, “ ‘the primary burden’ to assure that cases are brought to trial is ‘on the courts and the prosecutors.’ ” Ariegwe, ¶ 72 (quoting Barker v. Wingo, 407 U.S. 514, 529, 92 S. Ct. 2182, 2191 (1972)). “A defendant has no duty to bring himself to trial; the State has that duty.” Barker, 407 U.S. at 527, 92 S. Ct. at 2190 (footnote omitted); accord State v. Blair, 2004 MT 356, ¶ 23, 324 Mont. 444, ¶ 23, 103 P.3d 538, ¶ 23. Moreover, “society has a particular interest in bringing swift prosecutions, and society’s representatives are the ones who should protect that interest.” Barker, 407 U.S. at 527, 92 S. Ct. at 2190 (emphasis added). Thus, the Supreme Court has repeatedly held that the prosecutor and the trial court have an affirmative constitutional obligation to try the defendant *319 in a timely manner and that this duty requires a good faith, diligent effort to bring him to trial quickly. See Ariegwe, ¶ 65. Consistent with these principles, the prosecution bears the burden of explaining pretrial delays. Ariegwe, ¶¶ 64-65.
First Trial Setting: July 29, 2002 (199 Days of Delay)
¶131 Rose became an “accused” on January 11, 2002, when he was arrested in relation to the charges ultimately filed in the District Court. The first trial date set by the District Court was July 29, 2002. This constitutes a 199-day delay between arrest and the first trial setting. The District Court attributed this delay to the State as institutional delay. This Court appears to attribute 35 days of it to Rose. See Opinion, ¶¶ 49-51. An analysis under Ariegwe reveals both to be incorrect.
¶132 The following events occurred following Rose’s arrest:
• January 11: Initial appearance in Justice Court.
• January 23: Filing of the Information in District Court.
• February 6: Initial appearance in District Court. Upon inquiry by the court, defense counsel stated that he had recently received about 160 pages of discovery and needed time to review it before Rose would enter his plea. The court scheduled entry of plea for February 13.
• February 13: Rose entered a plea of not guilty. The District Court scheduled the omnibus hearing for March 6.
• March 6: Omnibus hearing. The District Court approved the Omnibus Hearing Memorandum. In addition, pursuant to its trial procedure, the court ordered Rose and the State to conduct a “face to face settlement conference” on April 18. The court stated that a trial date would “be set thereafter if necessary.”
• April 10: Status hearing. Defense counsel requested a continuance of the settlement conference. The District Court reset the conference for May 2.
• April 24: Hearing to address Rose’s complaints about defense counsel. At the conclusion of this hearing, the prosecutor and defense counsel advised the court that the case had not been settled.
• April 25: The District Court entered an order setting trial for July 29, 2002 (95 days out).
¶133 The 95-day delay between April 25 and the July 29 trial date is attributable to the State as institutional delay. Ariegwe, ¶ 68. But the 104-day delay between January 11 (Rose’s arrest) and April 25 is another matter. Again, the primary burden to assure that cases are *320 brought to trial is on the courts and the prosecutors, and the trial court itself has an “ ‘affirmative constitutional obligation’ ” to make a good faith, diligent effort to bring the defendant to trial quickly. Ariegwe, ¶¶ 65, 72. Given these constitutional mandates, there is simply no justification for a trial court’s failing to select a trial date at the earliest practical opportunity to do so.
¶134 Notably, in Ariegwe, the district court set trial at Ariegwe’s arraignment. In Billman, the district court issued an order 20 days after Billman’s arraignment scheduling the omnibus hearing and setting a trial date. In this case, however, the District Court did not set trial until well after the omnibus hearing. The State offers no justification for delaying until 50 days after the omnibus hearing and 71 days after Rose’s arraignment to set a trial date which, as noted, was 95 days out.
¶135 Absent exceptional circumstances, a trial court should be able to select a trial date by the time of the omnibus hearing or promptly thereafter. The purpose of this hearing, which is to be held “[w]ithin a reasonable time following the entry of a not guilty plea but not less than 30 days before trial,” is “to expedite the procedures leading up to the trial of the defendant.” Section 46-13-110(1), (2), MCA. At this point in time, the parties should have a good idea of whether a trial is “necessary.” Indeed, § 46-13-110(3), MCA, instructs the prosecutor and defense counsel to be prepared to discuss a number of pretrial matters, including the existence of a plea agreement; reliance on certain defenses; intent to seek persistent felony offender status; intent to rely on evidence of other crimes, wrongs, or acts; and change of venue. While a “face to face settlement conference” after the omnibus hearing might ultimately resolve the case, that is beside the point. There is always a risk that the case will not be settled, and the speedy trial right prohibits the court from placing that risk on the defendant by refusing to select a trial date until after the conference.
¶136 Here, on March 6, the District Court required the parties to have a “face to face settlement conference” on April 18 and stated that a trial date would be set thereafter, “if necessary.” While this procedure may have enabled the court to set only “necessary” trial dates, it conflicted with the court’s affirmative constitutional obligation to ensure that criminal defendants are brought to trial expeditiously. Fifty days later, after being apprised by the prosecutor and defense counsel that the case remained unresolved, the court set trial. Presumably, July 29 was the earliest suitable date; however, this does *321 not change the fact that a suitable date roughly 50 days earlier might have been possible had the court not delayed setting Rose’s trial.
¶137 The Court asserts that Rose’s counsel was “unprepared” at the March 6 omnibus hearing and requested additional time to investigate whether he should move for a change of venue. Opinion, ¶ 50. Conspicuously absent from the Court’s discussion, however, is the fact that the prosecutor likewise was “unprepared” and, thus, requested additional time to file his notice under State v. Just, 184 Mont. 262, 274, 602 P.2d 957, 963-64 (1979), and State v. Matt, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991). The District Court gave defense counsel until March 27 to file a change of venue motion and gave the prosecutor until March 29 to file his Just/Matt notice. Nevertheless, the Court assigns 21 days of delay to Rose. Opinion, ¶ 50. This approach is erroneous for two reasons.
¶138 First, the District Court’s policy, as stated in the Omnibus Hearing Memorandum, was not to set a trial date until after the settlement conference, which was slated for April 18. Thus, defense counsel’s request for additional time to investigate a change of venue had absolutely no impact on the setting of a trial date in this case. Both his investigation and his motion were to be completed several weeks before the settlement conference was to occur. Consequently, the Court here is doing exactly what we said in Ariegwe a court should not do: “consider any actions taken by the State or the accused which do not result in a postponement of the trial date.” Ariegwe, ¶ 63. Defense counsel’s request did not delay Rose’s trial; thus, there is no basis for the Court to assign Rose the 21 days of delay.
¶139 Second, and more to the point, neither Rose’s request for additional time to investigate a change of venue nor the State’s request for additional time to file its Just/Matt notice precluded the District Court from setting a trial date. The record reflects that that a three-to four-month delay between setting a trial date and holding the trial was typical for the District Court during this period. Had the court set trial on March 6 for June 10, instead of setting it on April 25 for July 29, 50 days of delay could have been averted. While this might appear to be speculative, the critical point here is that the State has the burden of justifying the pretrial delays, and that burden in this case is “increased substantially” (Opinion, ¶ 46) due to the extent of the delay. Yet, the State has offered no justification for the District Court’s waiting until April 25 to select a trial date.
¶140 Based on the foregoing analysis, I conclude that the 199-day delay between arrest and the first trial setting is properly attributed *322 as follows. First, from the January 11 arrest to the March 6 omnibus hearing (54 days): Accepting, for the sake of argument, the Court’s assertion that Rose delayed the selection of a trial date by 7 days when he requested time to review discovery before entering his plea (Opinion, ¶ 49), 47 days are attributable to the State as institutional delay and 7 days are attributable to Rose as acceptable delay in preparing his case. See Ariegwe, ¶¶ 68-72. Second, from March 7 to April 25 (50 days): Because this delay resulted from the District Court’s decision to postpone setting Rose’s trial date, for which the State has provided no justification, it is attributable to the State and weighted more heavily than unavoidable delay inherent in the criminal justice system. See e.g. Ariegwe, ¶¶ 126-128. Lastly, from April 26 to July 29 (95 days): These days are attributable to the State as institutional delay.
Second Trial Setting: November 18, 2002 (112 Days of Delay[1])
¶141 The Court notes that on July 11, 2002, defense counsel filed a motion to continue the trial and included a “waiver” of Rose’s right to a speedy trial. Opinion, ¶ 52. Based on this single fact, the Court attributes all 112 days to Rose. Opinion, ¶ 52. While I do not necessarily disagree with the Court that Rose is responsible for some, if not all, of this delay, the question is not as straightforward as the Court’s reasoning suggests. For one thing, the Court simply assumes that Rose’s supposed “waiver” was valid. Moreover, the Court fails to consider a number of pertinent circumstances related to the continuance.

Rose’s Motion to Continue and “Waiver”

¶142 Through a series of letters sent to the District Court in April, May, and June 2002, Rose expressed dissatisfaction with court-appointed counsel Larry Mansch. At a status hearing held June 19, Rose stated that he wanted a different attorney, and Mansch indicated that his ability to communicate with Rose had been compromised. Mansch advised the court that he had spoken with Dustin Gahagan about assuming the case, and the County Attorney concurred with this suggestion, stating that “the best thing we could do at this point is relieve Mr. Mansch, appoint Mr. Rose another attorney, with the understanding that trial is set for July 31st [sic], I think that gives the other attorney time to come up to speed on the case.” Accordingly, the *323 court appointed Gahagan to replace Mansch and instructed Gahagan to advise the court if a trial postponement was needed.
¶143 On July 11, Gahagan filed the motion to continue, explaining as follows:
The undersigned has not been on this case very long and needs additional time to review the evidence and prepare a defense. Defendant has signed a handwritten waiver of his right to a speedy trial and the undersigned will execute and file a more formal waiver in the near future.[2] Another reason for the request is that the undersigned is no longer a part of the “conflict public defender” contract with Ravalli County. Because the undersigned is currently extremely busy, the new “conflict public defenders” have been contacted about taking over this case and they have indicated that they would also need additional time to prepare for trial. County Attorney George Corn has been contacted and does not oppose a continuance.
Attached to the motion was a piece of paper on which a single handwritten statement appeared: “I Robert L. Rose here by wave [sic] my Right to a Quick and Speedy Trial.” This statement was dated July 10.
¶144 On July 12, Rose sent a letter to the District Court in which he explained, on one hand, that “I was hoping not to have to wave [sic] my Right to a speedy trial,” but on the other hand, that “I do not feel it is possible for me to have a fair trial if it is not postponed.” According to Rose, Gahagan had told him that he (Gahagan) would not have time to prepare for trial.
¶145 On July 19, the District Court sent Rose a letter stating that the motion to continue would he granted. In addition, the court informed Rose that Gahagan “is no longer a contract public defender which may require reassignment of your defense to the new conflict public defenders in the immediate future.” Also on July 19, Gahagan filed a motion to substitute Kelli Sather as defense counsel “for the reason that Kelli S. Sather and Sasha Brownlee now have the conflict contract with Ravalli County and all cases need to be transferred to new counsel.” The court granted this motion on July 22. On July 29, the District Court entered an order resetting trial for November 18.
¶146 Without citation to any authority, the Court asserts that “in most cases, once the defendant waived his right to a speedy trial, it is *324 unnecessary to continue with an analysis of whether that right has been violated.” Opinion, ¶ 53. This statement is patently incorrect. Assuming for the moment that Rose’s one-sentence “waiver” is valid, it was attached to a specific motion to continue, and nothing in the waiver indicates that Rose intended to waive his right to a speedy trial for all pretrial delays. The waiver, rather, was intended (as Rose later confirmed in his July 12 letter) to secure a continuance of the July 29 trial date. The Supreme Court has said that courts “should indulge every reasonable presumption against waiver” and “not presume acquiescence in the loss of fundamental rights.” Barker, 407 U.S. at 525-26, 92 S. Ct. at 2189 (internal quotation marks omitted). Accordingly, the Court errs in suggesting that Rose’s supposed waiver applied to all of the delays in this case. See United States v. DeLongchamps, 679 F.2d 217, 219 (11th Cir. 1982) (“The defendants’ waivers were manifestly intended to secure a continuance and were submitted for no other purpose. Indulging every reasonable presumption against waiver of the right to a speedy trial, we decline to hold that the waivers extended to other delays in this case.” (citations omitted)).
¶147 At a more fundamental level, however, I question the validity of this waiver. It is well-established that “any waiver of one’s constitutional rights must be made specifically, voluntarily, and knowingly.” State v. Tapson, 2001 MT 292, ¶ 25, 307 Mont. 428, ¶ 25, 41 P.3d 305, ¶ 25 (citing Park v. District Court, 1998 MT 164, ¶ 36, 289 Mont. 367, ¶ 36, 961 P.2d 1267, ¶ 36, in turn citing Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938), and State v. Lucero, 151 Mont. 531, 538, 445 P.2d 731, 735 (1968)). The Supreme Court has “placed the entire responsibility on the prosecution to show that the claimed waiver was knowingly and voluntarily made.” Barker, 407 U.S. at 529, 92 S. Ct. at 2191. The State, however, has made no effort in the present case to show that Rose’s waiver was made knowingly and voluntarily.
¶148 In this connection, Rose contends that he was “forced” to choose between his right to effective assistance of counsel and his right to a speedy trial. He cites Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967 (1968), in which the Supreme Court observed:
[The defendant] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable *325 that one constitutional right should have to be surrendered in order to assert another.
Simmons, 390 U.S. at 394, 88 S. Ct. at 976. Rose also relies on State v. Blair, 2004 MT 356, 324 Mont. 444, 103 P.3d 538, in which we agreed with the following argument by defense counsel in support of Blair’s speedy trial motion:
“[Rjegardless of the fact that I am in fact Mr. Blair’s third attorney and that he had two before, he is in no way responsible for that. He’s not accountable for that, and certainly is entitled, regardless of personnel changes in the Yellowstone County Public Defender’s Office, to a timely and effective representation.”
Blair, ¶ 22.
¶149 In the present case, according to the report filed by Sasha Brownlee in May 2003, Gahagan asked Rose to sign the purported waiver “as Gahagan was no longer going to work for the county and [Rose] would be assigned new counsel.” A defendant, however, cannot be required to waive his right to a speedy trial simply because the public defender contract is changing hands and his new counsel will not be prepared for trial. It is doubtful that such a waiver is “voluntary.” Moreover, the defendant certainly should not be blamed for delay caused by personnel changes within the public defender system.
¶150 I accept that Rose’s objections to Mansch’s representation, which ultimately led to Mansch’s replacement on June 19, contributed to the need for a continuance of the July 29 trial date. On the other hand, Rose could not be required to choose between his right to effective assistance of counsel on one hand and his right to a speedy trial on the other. Simmons, 390 U.S. at 394, 88 S.Ct. at 976.

The State’s Motion to Add Witnesses

¶151 Wholly aside from the substitutions of Rose’s appointed counsel, another event occurring in early July 2002 bears on the instant discussion. Section 46-11-401(2), MCA, requires the prosecution to “include endorsed on the information or indictment the names of the witnesses for the prosecution, if known.” When the prosecutor filed the Information on January 23,2002, he endorsed ten witnesses:
• RCSO Lt. Bruce Hennell
• RCSO Deputy Zae Hudson
• RCSO Sgt. Kevin McConnell
• RCSO Deputy Steve Holton
• Marcus Daly Hospital employees
*326 • RCSO Detention Officer Lt. Andy Kollmer
• RCSO Detention Center personnel
• John H. Beck
• Geneviere Indreland
• Kermit Indreland
¶ 152 Although the prosecution may disclose additional witnesses at the omnibus hearing, see §§ 46-13-110(3)(e) and 46-15-322(l)(a), MCA, there is no record that such witnesses were mentioned at the March 6, 2002 omnibus hearing in this case. However, on July 8, a mere 21 days before trial, the State filed a motion to add 13 new witnesses to the Information. The following witnesses were listed in the motion:
• Sgt. Detective Pete Clarkson, RCSO
• Detective Sterling Maus, RCSO
• Detective Jim Chinn, RCSO
• Officer Donald Wilks, RCSO
• Officer Rick Hardy, RCSO
• Kirk Davies, Missoula, MT
• Dr. Brett Bender, Marcus Daly ER, Hamilton, MT
• Dr. Frederick M. Ilgenfritz, Marcus Daly ER, Hamilton, MT
• Dr. Walker J. Ashcraft, Marcus Daly, Hamilton, MT
• Mary Wojciechowski, RN, Marcus Daly Hospital, Hamilton, MT
• Brian Finkle, Ph.D., Cameron, MT
• John Hyslip, Risk Manager, Pathways Treatment Center, Kalispell, MT 59901
• Mark Dalby, Ravalli County, MT
The District Court granted the State’s motion on July 9. Defense counsel filed the motion to continue the trial two days later.
¶153 The prosecutor offered no justification for not endorsing these witnesses sooner, and it is difficult to conceive of a meritorious explanation for why the prosecution apparently was unaware, prior to July 8, 2002, that Kirk Davies (one of the victims of the charged offenses), five members of the Ravalli County Sheriff s Office, and four healthcare professionals from Marcus Daly Hospital had relevant testimony to provide at Rose’s trial. In any event, the point here is that even if Mansch had stayed on as Rose’s counsel, the State’s endorsement of 13 new witnesses 21 days before trial likely would have necessitated a continuance. For this reason, I cannot agree with the State’s assertion that “there would have been no delay but for Rose’s request for new counsel.”

*327
Conclusion

¶154 The State must provide particularly compelling justifications for the delay in this case. See Ariegwe, ¶ 123. Moreover, “[a]ny delay not demonstrated to have been caused by [Rose] or affirmatively waived by [Rose] ... is attributed to the State by default.” Ariegwe, ¶ 65. If these standards are to have any meaning in our speedy trial framework, I cannot agree with the Court that the 112-day delay between the first and second trial settings should be attributed solely to Rose. Opinion, ¶ 52. The State has the burden to show that that Rose’s “waiver” was made knowingly and voluntarily, but the State has not done so. The State also has the burden to show that postponement of the July 29 trial date was caused by Rose, but the record is ambiguous on this point. The postponement may have been necessitated by institutional changes in the public defender system, by the prosecution’s motion to add 13 new witnesses 21 days before trial, by the replacement of Mansch at Rose’s request about six weeks before trial, or by all of these factors.
¶155 The Court makes the valid point that “[w]hen a defendant makes requests for new counsel and then withdraws those requests only to renew those requests later, requiring a hearing and ultimately resulting in the withdrawal of counsel, the delay caused is appropriately attributed to the defendant.” Opinion, ¶ 58 (citing State v. Ellenburg, 2000 MT 232, ¶¶ 22-24, 301 Mont. 289, ¶¶ 22-24, 8 P.3d 801, ¶¶ 22-24, and State v. Collier, 277 Mont. 46, 55-56, 919 P.2d 376, 382-83 (1996)). Yet, the record in this case does not establish that Rose’s complaints about court-appointed counsel were meritless. See Ellenburg, ¶ 24 (observing that Ellenburg’s “meritless” complaints delayed his trial). And to the extent Rose’s complaints were made in the legitimate exercise of his right to effective assistance of counsel, he cannot be charged with the resulting delay.
¶156 For these reasons, I conclude that responsibility for the 112 days should be shouldered in part (if not in whole) by the State, given the State’s heavy burden to justify the delay and the State’s failure to make the proper showings here. That being said, attributing the 112 days to Rose (as does the Court, see Opinion, ¶ 52) does not change my ultimate conclusion under Factor Two. Thus, for the sake of argument, I will assume that this delay is attributable to Rose.
Third Trial Setting: May 12, 2003 (175 Days of Delay[3])
*328 ¶157 On October 25, 2002, defense counsel (Sather) filed a Motion for Psychological Examination. At a hearing on October 28, the District Court advised Rose that the trial would have to be rescheduled if an evaluation was conducted. Rose indicated that he understood this. The court then granted the motion. The court stated, however, that a new trial date would not be set until the evaluation was received.
¶158 Of the 175 days between November 18, 2002 (second trial setting) and May 12, 2003 (third trial setting), the District Court attributed 86 days to Rose and 89 days to the State. The court reasoned that the time it took to complete the psychological evaluation was Rose’s responsibility and the time between completing the evaluation and trial was the State’s responsibility. The flaw in this reasoning, however, is that these two time periods could have elapsed simultaneously had the court promptly rescheduled trial upon granting Rose’s motion.
¶159 The first trial date in this case was set on April 25, 2002, for July 29, 2002 (about three months out); the second trial date was set on July 29,2002, for November 18,2002 (nearly four months out); and the third trial date was set on February 19, 2003, for May 12, 2003 (almost three months out). Thus, on October 28, 2002, when the court granted the Motion for Psychological Examination and vacated the existing trial date, had the court then set a new trial date, the new date likely would have been sometime in February 2003. (Actually, the prosecutor pointed out during the October 28 hearing that “trial dates are already being scheduled in March.”) But that did not occur. Rather, the court stated that “I won’t set [the trial date] until we get the report in.” As a result, there is a significant period of time (October 28, 2002, to February 19, 2003) during which there was no trial date set in this case at all.
¶ 160 Such delay is unacceptable, and it clearly is not attributable to Rose. As explained above, the trial court shares the duty of assuring that a criminal case is brought to trial expeditiously. This includes maintaining a trial date. Having a pending trial date provides an impetus for the parties to prepare their cases diligently for trial, which in turn lessens the chance of a speedy trial violation. It also creates a favorable situation in which “docket delay” (i.e., delay caused by the reality that trial dates have to be set a number of months in advance) transpires simultaneously with the time required by the parties to prepare their cases.
¶161 By waiting until February 19, 2003, to set a trial date, the District Court created needless delay (during which, incidentally, Rose *329 was incarcerated). Had the court, on October 28, 2002, set a trial date for, e.g., March 3, 2003 (about four months out), and had Rose’s counsel requested additional time to review the psychological report (which counsel received during the first week of February 2003), then such delay would have been properly attributed to Rose. But Rose was never even given the opportunity to proceed to trial in early March 2003 because the District Court failed to set a new trial date promptly after it vacated the November 18, 2002 trial date.
¶162 This Court attributes the entire 175-day period to Rose on the ground that his Motion for Psychological Examination caused the District Court to vacate the November 18 trial date. Opinion, ¶ 54. Yet, for the reasons just discussed, although Rose’s motion caused the court to vacate the existing trial date, the motion did not in any way preclude the court from promptly setting a new trial date. Rather, the court of its own accord decided to allow four months to pass by without a pending trial date in Rose’s case. Notably, the parties were ready to proceed in mid-February 2003, but they had to wait an additional three months to go to trial due entirely to the District Court’s failure to maintain a trial setting for Rose on the court’s docket.
¶163 For these reasons, I conclude that of the 175 days between the second and third trial settings, the 93 days of avoidable delay during which no trial date was set (November 18,2002, to February 19,2003) is attributable to the State and weighs more heavily than institutional delay. The remaining 82 days are attributable to Rose.
Fourth Trial Setting: June 2, 2003 (21 Days of Delay)
¶164 This postponement was necessitated by a conflict in the District Court’s calendar. The 21-day delay is attributable to the State as institutional delay.
Summary
¶165 In sum, the interval between accusation and trial in this case was 507 days. Of that, 306 days (60 percent) are attributable to the State as follows: 163 days as institutional delay, and 143 days as avoidable delay in setting trial dates. The remaining 201 days (40 percent) are attributable to Rose due to his trial preparations. Significantly, there is no evidence of stonewalling on the part of the prosecution. Indeed, on a number of occasions, the prosecution expressed concern about the speedy trial issue and objected to postponing the trial date. On the other hand, given the State’s substantially increased burden to justify the delay in this case (Opinion, ¶ 46), and given the amount of delay attributable to the *330 State that could have been avoided, I conclude that Factor Two weighs in Rose’s favor, though only slightly.
FACTOR THREE: ROSE’S RESPONSES TO THE DELAY[4]
¶166 At the outset, I note the Court’s assertion that “[t]he State’s response to the motions for delay indicates its desire to proceed to trial.” Opinion, ¶ 62. As explained in Ariegwe, however, the critical question under Factor Three is “whether the accused actually wanted to be brought to trial promptly.” Ariegwe, ¶ 76 (emphasis added). The State’s desire to proceed to trial has little, if any, relevance to this question. Rather, we must evaluate Rose’s responses to the pretrial delays. See Ariegwe, ¶¶ 79-81. Conduct evidencing a desire to be brought to trial promptly weighs in Rose’s favor, whereas conduct demonstrating a desire to avoid trial weighs against Rose in the overall balancing. See Ariegwe, ¶ 85.
¶167 Some of Rose’s pretrial letters suggest ongoing frustration about the pace at which defense counsel was investigating and preparing the defense. Yet, many of Rose’s actions (such as the repeated about-faces concerning Mansch’s representation and the request for a psychological examination in spite of the fact that it would require a trial postponement) suggest that Rose was not overly concerned about the pretrial delays. Likewise, although Rose asserted his right to a speedy trial in a number of court filings beginning in late-February 2003, the sincerity of these assertions is questionable. See Opinion, ¶ 61 (referring to Rose’s assertions as “half-hearted”). Considering the totality of Rose’s conduct, I agree with the Court that Factor Three weighs in favor of the State.
FACTOR FOUR: PREJUDICE TO ROSE
¶168 Under Factor Four, we assess whether Rose was prejudiced in the light of the interests that the speedy trial right was designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern, and limiting the possibility that the defense will be impaired. See Ariegwe, ¶¶ 86-88. As noted, the State must make a “highly persuasive showing” that Rose was not prejudiced by the delay. Opinion, ¶ 66.
*331 ¶169 I generally agree with the Court’s analysis under Factor Four (Opinion, ¶¶ 69-85), except with respect to the oppressiveness of the incarceration. Rose was incarcerated at the Ravalli County Detention Center (RCDC) for the entire 507 days between arrest on January 11, 2002, and trial on June 2, 2003. He spent the first seven months isolated in a maximum security cell. He testified in the District Court (during the speedy trial hearing) that he was not allowed contact with other inmates during this period. He was in his cell for at least 23 hours a day, and some days he was not let out of his cell at all. His only human contact was with the guards when they delivered his meals through a food slot. He ate alone in his cell, which was seven feet wide and approximately ten feet long and had a cement floor, a cement ceiling, cinderblock walls, and a stainless steal toilet and sink. The only window was a four inch by four inch piece of glass in the door.
¶170 Rose claims he was placed in isolation despite strong indications that he suffered from existing mental health issues including bipolar disorder. Rose cites Walker v. State, 2003 MT 134, 316 Mont. 103, 68 P.3d 872, in which we recognized “the psychological harm caused by placing inmates in a severely restrictive setting for nearly 24 hours a day,” which can manifest as massive anxiety, acute confusion, paranoia, concentration and memory problems, and aggressive or self-destructive behaviors. Walker, ¶ 66. In this connection, Paul Graves, who met with Rose almost weekly as part of the jail ministry, testified that Rose lost around 15 or 20 pounds during his isolation and that the slight limp Rose had when they first met appeared to worsen over this period.
¶171 During the winter months, Rose’s cell was “unbearable” in terms of temperature. Rose testified that there were “times you could see your breath in the cell and there was just no relief.” He was allowed only one blanket and would “shiver all night long.” He also stated that he was threatened with disciplinary action when he plugged a vent that blew cold air into his cell. Cathy Powell, RCDC Commander, acknowledged at the speedy trial hearing that there had been problems with the heating. She testified that these problems have since been remedied.
¶172 The State asserts that “[njeither the length nor the conditions of Rose’s pretrial incarceration were oppressive in light of the nature of the charged offenses, Rose’s criminal history and Rose’s drug history.” The Court appears to agree. See Opinion, ¶ 71. Yet, even if Rose’s pretrial incarceration was necessitated to an extent by the factors set forth in the bail statute (§ 46-9-301, MCA), nothing about *332 the nature of the charged offenses, Rose’s criminal history, or Rose’s drug history could justify subjecting him for an extended period of time to the conditions discussed above.
¶173 Rose was incarcerated for 507 days in a short-term holding facility. He spent the first seven months isolated in a maximum security cell. Considering the duration and conditions of that incarceration, I conclude that the incarceration was oppressive. However, as noted, I agree with the Court that the delay in bringing Rose to trial did not unduly prolong the disruption of his life or aggravate the anxiety and concern inherent in being accused of a crime. Opinion, ¶ 77. Likewise, it does not appear that the delay significantly impaired Rose’s ability to present an effective defense. Opinion, ¶¶ 81-83. For these reasons, I conclude that Factor Four weighs slightly in favor of the State.
BALANCING
¶174 There was a substantial delay of 507 days between Rose’s arrest and his last scheduled trial date. A significant portion of that delay (28 percent) was caused by the District Court’s delay in setting trial dates. And Rose’s incarceration was oppressive due to the conditions of the incarceration and the amount of time Rose was subjected to them.
¶175 On the other hand, there is no evidence of stonewalling by the prosecution. To the contrary, the prosecutor objected to several of the delays in this case. Moreover, Rose is responsible for 40 percent of the delay, and his actions during much of the pretrial period suggest that he was not overly concerned about the delays. Finally, it does not appear that Rose’s ability to present an effective defense was significantly impaired by the delay or that the delay aggravated or unduly prolonged Rose’s anxiety and concern.
¶176 For these reasons, I reach the same conclusion as the Court: The District Court did not err[5] in denying Rose’s motion to dismiss for lack of a speedy trial. I base this conclusion, however, on the foregoing analysis under Ariegwe.
JUSTICE COTTER joins the Special Concurrence of JUSTICE NELSON.

 The Court calculates “102 days.” Opinion, ¶ 52. However, the period beginning July 30, 2002, and running through November 18, 2002, spans 112 days.

2 It does not appear that the “more formal waiver” was ever executed.

 The Court calculates “171 days.” Opinion, ¶ 54. However, the period beginning November 19, 2002, and running through May 12, 2003, spans 175 days.

 The Court captions this factor: “Response to the delay and assertion of speedy trial right.” Opinion, ¶ 59. In Ariegwe, however, we explicitly “abandon[ed] the ‘Assertion of the Right’ label” and stated that, henceforth, we would “refer to Factor Three as ‘The Accused’s Responses to the Delay.’ ” Ariegwe, ¶ 85.

 The Court states that the District Court did not “abuse its discretion” in denying Rose’s speedy trial motion, Opinion, ¶ 92, but that is clearly the wrong standard. As we explained in Ariegwe, and as the Court acknowledges in ¶ 36 of the Opinion, “whether the defendant has been denied a speedy trial... is a question of constitutional law,” which we review “de novo,” not for abuse of discretion. Ariegwe, ¶ 119.